Eric G. Maxfield (8668)
Darren G. Reid (11163)
Brandon T. Christensen (16420)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700
egmaxfield@hollandhart.com
dgreid@hollandhart.com
btchristensen@hollandhart.com
*Attorneys for Defendant*

---

## IN THE UNITED STATES DISTRICTCOURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TREVOR MILTON,<br><br>   Plaintiff,<br><br>vs.<br><br>DAVID BATEMAN,<br><br>   Defendant. | **RULE 12(b)(6) MOTION TO DISMISS**<br><br>Case No. 2:20-cv-00700-HCN-DBP<br><br>Judge Howard C. Neilson, Jr.<br><br>Magistrate Judge Dustin Pead |

Pursuant to Fed. R. Civ. P. 12(b)(6), David Bateman moves to dismiss Plaintiff Trevor

Milton's claims for defamation per se and public disclosure of private facts.

### PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR THE MOTION

In the immediate wake of numerous allegations of fraud and sexual assault, Milton, the

recent Executive Chairman of Nikola Corporation, is lashing out at Bateman for sharing

important information related to the troubling conduct of the disgraced billionaire and business

leader.  By filing a baseless lawsuit, Milton believes he can muzzle Bateman and the courageous

women who have publicly shared their stories detailing Milton's disturbing pattern of deceit and

sexual misconduct.  The Court should dismiss Milton's Complaint for failing to allege facts to support claims for defamation per se and public disclosure of private facts.

From September 19 to September 28, Bateman posted messages on his Twitter account relating to allegations of sexual assault against Milton.  The timing and context of Bateman's tweets are significant.  First, on September 10, Hindenburg Research, a Nikola shareholder and respected research firm, published an investigative report alleging massive fraud by Milton, the company's Founder and Executive Chairman.  Among other things, Hindenburg alleged the public company's proprietary technology is a sham.  The headline news rocked the investment world and led to Milton's resignation ten days later.

Second, on September 13, considering the fraud allegations against Milton, Whole Mars Catalog Blog published on its popular Twitter account an audio recording of Milton describing an alleged extortion attempt against him by Jonny Robb in April 2020.  According to Milton, Robb threatened to disclose information that would harm Milton's reputation, *i.e.*, information related to his alleged sexual misconduct.  Tragically, Robb took his own life on May 7, shortly after being released from custody for charges related to extortion and drug possession.

David Bateman is Robb's close friend.  In response to Whole Mars' publication of Milton's version of the story surrounding Robb's death, Bateman posted on his Twitter account text messages supporting the sexual assault allegations against Milton.  Bateman posted text messages between Milton and Robb, which appear to show that Robb was intending to disclose information relating to Milton's inappropriate conduct with women.  Bateman also posted or referred to text messages and Facebook posts from other women coming forward with serious sexual assault allegations against Milton.  None of Bateman's tweets supports claims for

defamation per se and public disclosure of private facts.  Ultimately, Milton's Complaint fails to

allege sufficient facts necessary for the elements of his two causes of action.

I.     **FACTUAL BACKGROUND**[1]

    A.     **The Milton/Nikola Fraud Allegations**

Nikola Corporation ("Nikola") is a public company that has announced concept zero-

emissions vehicles since 2016.  On September 8, General Motors announced a strategic

partnership with Nikola, where GM would manufacture Nikola's first pickup, producing both

electric-battery and fuel-cell versions of the truck.  After the announcement, Nikola's stock price

jumped 53% according to reports.  Two days later, on September 10, Hindenburg Research

published an explosive investigative report showing "extensive evidence" that "Nikola is an

intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman

Trevor Milton's career."[2]  This news hit social media and major news outlets across the country,

including The New York Times, Forbes, Fox Business, NBC, and Business Insider.[3]

---

[1]  For the purposes of this motion only, the Complaint's factual allegations are taken as true. Bateman does not admit any of the Complaint's allegations by way of this Motion and reserves the right to challenge any of the allegations at any further stage of this litigation.

[2]  Hindenburg Research, *Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America* (Sept. 10, 2020), https://hindenburgresearch.com/nikola/ (the "Hindenburg Report").  *See* Declaration of Brandon T. Christensen ("Christensen Decl.") ¶ 2.

[3]  The Hindenburg Report was widely publicized national news.  *See, e.g., id.* (collecting websites referencing the Hindenburg Report and its allegations).  The Court may take judicial notice of the existence of the Hindenburg Report—and the other news articles and social media messages described in this Motion and the Christensen Decl.—and the fact these articles and the information therein were widely published, which is relevant to the context of Bateman's alleged tweets.  *Am. Bankers Ass'n v. NCUA*, 347 F. Supp. 2d 1061, 1068 (D. Utah 2004) (explaining that "[a] court may take judicial notice of facts reported in newspaper articles if the facts are capable of a sufficiently accurate and ready determination" and taking judicial notice of a Deseret News article) (quoting 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 201.12[2] (2d ed. 2004)).  *See also Ratheal v. McCarthy*, No. 2:17-cv-00997, 2018 U.S. Dist. LEXIS 162081, at *11 (D. Utah Aug. 31, 2018) (taking judicial notice of a Salt Lake

According to Hindenburg, it had "never seen this level of deception at a public company, especially of this size."  The Report included "recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by Nikola Founder Trevor Milton."  It described that Nikola made false or misleading claims about having proprietary battery technology, natural gas wells, solar panels, and hydrogen production capabilities.  It stated that while Milton claimed Nikola designed key components of its vehicles in house, the technology was licensed or bought from third parties.  It also highlighted the "total farce" of Nikola's semi-truck demonstrations, where the company used a secret electrical cable to power the truck on a stage or, even more ridiculously, rolled the truck down a hill to make it seem like it was operational.

While Milton and Nikola had already willingly thrusted themselves into the media for a long period of time, the Hindenburg Report generated significant additional public interest in Nikola and Milton personally.  On September 14, Bloomberg News reported that the Securities and Exchange Commission was conducting a preliminary review to see if Nikola broke any securities laws.[4]  The next day, the Financial Times reported that the Department of Justice was looking into Hindenburg's allegations as well.[5]  Milton affirmatively took to Twitter to address

Tribune article that was "central to [plaintiff's] defamation claims); Prince, Richardson on Evidence § 2-204 (collecting cases taking judicial notice of "'current events' at the time of decision").

[4]  Matt Robinson & Edward Ludlow, *SEC Examining Nikola Over Short Seller's Fraud Allegations*, Bloomberg (Sept. 14, 2020), https://www.google.com/amp/s/www.bloomberg.com/amp/news/articles/2020-09-14/sec-said-to-examine-nikola-over-short-seller-s-fraud-allegations.  Christensen Decl. ¶ 3.

[5]  Claire Bushey, et al., *US justice department inquires into Nikola fraud claims*, Financial Times (Sept. 15, 2020), https://www.ft.com/content/a45a6638-167b-4e27-a9fd-576e7229f959.  *See also* Wikipedia, *Trevor Milton* (Oct. 22, 2020) (collecting news sources regarding the Hindenburg

the Hindenburg Report.[6]   One commenter questioned in response to the Report: "What is the connection between Trevor Milton and the murder of Jonathan Howard Robb?"[7]   Milton's cousin, Aubrey Ferris Smith, also commented on Facebook with a link to the Hindenburg Report: "Can't say I'm surprised that my cousin's predatory and pathological lies are being exposed, esp [sic] considering my personal experience with him... I'm really sad that his horrific fraud and greed have affected and continue to affect a lot of innocent people."[8]   Dozens of news organizations reported on these swirling allegations.[9]

Milton resigned as Nikola's Executive Chairman on September 20.  CNBC reported that as part of his sudden departure, Milton, who is Nikola's founder and largest shareholder, gave up company equity valued at $166 million at the time and a $20 million consulting contract.  He continues to hold Nikola stock valued at $3.1 billion at the time.[10]

---

Report and federal investigations), https://en.wikipedia.org/wiki/Trevor_Milton.  Christensen Decl. ¶¶ 4-5.

[6]  Kristen Korosec, *Nikola disputes fraud claims in carefully worded rebuttal*, TechCrunch (Sept. 14, 2020), https://techcrunch.com/2020/09/14/nikola-disputes-fraud-claims-in-carefully-worded-rebuttal/ ("Nikola's lengthier denial follows a series of tweets made last week by the company's founder, Trevor Milton, who called the report by the activist short-seller a 'hit job' based on false allegations.").  Christensen Decl. ¶ 6.

[7]  Hindenburg Report, comment on September 12, 2020 by user "D.C."

[8]  Aubrey Smith, "Can't say I'm surprised," Facebook (Sept. 14, 2020), https://www.facebook.com/552896000/posts/10158240123801001/?extid=0&d=n.  Screenshots of this post are attached to the Christensen Decl. as Exhibit A.

[9]  Hindenburg Report (collecting websites referencing the Hindenburg Report and its allegations).

[10]  M. Wayland & D. Kopecki, *Nikola founder Trevor Milton forfeits $166 million in stock he would have lost anyway and gets to keep $3.1 billion under separation deal*, CNBC (Sept. 21, 2020), https://www.cnbc.com/2020/09/21/nikola-founder-trevor-milton-forfeits-166-million-in-stock-and-gets-to-keep-3point1-billion-under-separation-deal.html.  Christensen Decl. ¶ 8.

### B.       The Jonny Robb Extortion Allegations

On April 15, 2020, Milton's long-time friend, Jonathan Howard Robb ("Jonny Robb" or "Robb"), was arrested for alleged extortion and drug possession.  According to the affidavit for probable cause, Robb threatened to publicly disclose information about Milton that would harm his reputation and business.[11]  Robb allegedly told Milton he would not post the information in exchange for money.  Working in connection with law enforcement, Milton met with Robb purportedly to turn over some of the funds, but instead Robb was taken into police custody.  Tragically, after spending time in custody, Robb was released and took his own life on May 7.

On September 13, three days after the Hindenburg Report, the Whole Mars Catalog Blog ("Whole Mars") released an audio recording on its Twitter account of an interview with Milton, who affirmatively discusses the Jonny Robb story.[12]  Whole Mars is a blog dedicated to exploring Mars and the technologies to get there, including reports on battery technologies from Tesla and Nikola.  It states it released the Milton recording to avoid "withhold[ing] potentially relevant information" considering the recent fraud allegations against him and questioned, "[w]hat was it that he [Robb] was posting that Trevor couldn't have out?".

Among other things, Milton made the following claims about Robb:

- Robb was on drugs and doing more than a lethal dose of acid.

---

[11]  The Complaint cites and quotes directly from the affidavit for probable cause.  Compl. ¶ 11. It is central to Milton's claims in this lawsuit.  The Court may therefore consider the affidavit and its contents without converting this to a motion for summary judgment.  *See Gascoigne v. Gascoigne*, 2010 WL 1418881, at *2 (D. Utah Apr. 7, 2010).  A copy of the affidavit for probable cause is attached to the Christensen Decl. as Exhibit B.

[12]  @WholeMarsBlog, "Trevor telling the Johnny Robb story," *Twitter* (Sept. 13, 2020 6:46 p.m.), https://twitter.com/WholeMarsBlog/status/1305306973290684418.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit C.  The recording linked to in these tweets is referred to herein as the "Whole Mars Interview."

- Robb and his friends created fake social media profiles to interact with Milton and to share false information about him.
- The Feds got involved because there were threats made on Milton's life.
- Robb was arrested for extortion.  He demanded $500,000 from Milton to not release the fake conversations with Milton.
- Milton asked Robb if paying him was the only way to make the harassment and death threats go away.  Milton said he begged Robb 20 times to stop.
- A psychologist said Robb believed he was doing the right things and that God told him to "sacrifice" Milton.
- After being arrested, the prison let Robb out because of Covid-19.  Milton implies that the prison is at fault for Robb's suicide, since more time in prison could have helped Robb detox.
- Milton also attributed Robb's suicide to the loss of his Instagram account (deleted because he used it for extortion), which was "all he had in his life."
- Milton said that some people had claimed Robb's suicide was his fault, which was hard for Milton to hear because he had been trying to help him.

### C.    The Sexual Assault Allegations Against Milton

In response to the Whole Mars audio recording, and in the context of social and news media buzz about Milton's business and personal conduct, Bateman posted several messages on his Twitter account relating to Milton's accusations against Robb and the allegations of sexual assault at the heart of those accusations.  On September 19, Bateman tweeted a series of texts between Milton and Robb.[13]  For the next several hours, Bateman tweeted his opinion on Milton and Robb's interactions.  The next day, Bateman, with permission, posted on his Twitter account an unidentified woman's private text messages with Milton.  Milton hired her for an out-of-town modeling shoot where he allegedly groped her and slept on the floor of her bedroom.[14]  On September 21, he tweeted additional text messages between Milton and this woman from "years

---

[13]  @davidbateman, "Because my dear friend Jonny isn't here to defend himself," Twitter (Sept. 19, 2020 12:56 a.m.), https://twitter.com/davidbateman/status/1307212066017521667. Screenshots of these tweets are attached to the Christensen Decl. as Exhibit D.

[14]  @davidbateman, "Another woman came forward," Twitter (Sept. 20, 2020 10:03 p.m.), https://twitter.com/davidbateman/status/1307893198472138753.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit E.

later."[15]  He also tweeted text messages between Milton and Robb.[16]  He then tweeted additional text messages between Milton and a second, unidentified woman.[17]

That same day, Milton's cousin, Aubrey Ferrin Smith, on her public Facebook page, accused him of sexually assaulting her in 1999, after their grandfather's funeral service.[18]  She was 15 and Milton was 17.  Bateman shared her post on his Twitter account.[19]  On September 28, Bateman tweeted "RIP Jonny #NikolaGate #Nikola," with a link to a CNBC article discussing the sexual assault allegations against Milton.[20]

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[15]  @davidbateman, "There were received by the 18-year old model," Twitter (Sept. 21, 2020, 1:47 a.m.), https://twitter.com/davidbateman/status/1307949647487332353.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit F.

[16]  @davidbateman, "Jonny told Milton," Twitter (Sept. 21, 2020 2:57 a.m.), https://twitter.com/davidbateman/status/1307967145821700098.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit F.

[17]  @davidbateman, "#NikolaGate," Twitter (Sept. 21, 2020 6:13 p.m.), https://twitter.com/davidbateman/status/1308197709640118272.  Screenshots of these tweets as attached to the Christensen Decl. as Exhibit F.

[18]  Aubrey Smith, "Trevor Milton is my cousin," Facebook (Sept. 21, 2020), https://www.facebook.com/552896000/posts/10158257212101001/?extid=0&d=n.  Screenshots of this post are attached to the Christensen Decl. as Exhibit G.

[19]  @davidbateman, "I spoke with this woman," Twitter (Sept. 21, 2020 7:52 a.m.), https://twitter.com/davidbateman/status/1308041361929633792.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit F.

[20]  @davidbateman, "RIP Johnny," Twitter (Sept. 28, 2020 8:34 p.m.), https://twitter.com/davidbateman/status/1310769883270053889.  Screenshots of these tweets are attached to the Christensen Decl. as Exhibit H.

544, 570 (2007)).  When reviewing the adequacy of a complaint, a court "must accept as true all of the allegations contained in [the] complaint," but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (*quoting Ashcroft*, 556 U.S. at 678).  The complaint must "provide enough factual allegations for a court to infer potential victory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

## III.   ARGUMENT

### A.   Milton Cannot Establish a Claim for Defamation Per Se

Milton's claim for defamation per se fails because: (1) Milton has not alleged facts to show that Bateman's tweets were false and defamatory; (2) Milton has not alleged facts to show that Bateman's tweets were charges of criminal conduct; and (3) Milton is a limited-purpose public figure and has not alleged facts to show that the tweets were made with actual malice.

#### *1.     Bateman's statements are not per se defamatory.*

In Utah, to establish defamation a plaintiff must show '(1) the defendant published the statements in print or orally; (2) the statements were false [and defamatory]; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages.'" *Eskamani v. Auto-Owners Ins. Co.*, 2020 UT App 137, ¶ 28 (quoting *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535 (quotation simplified)).

"The First Amendment demands that the court 'conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation' without 'indulging inferences in favor of the nonmoving party.'" *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1233-34 (D. Utah 2018) (citing *West v. Thomson Newspapers*, 872 P.2d 999, 1009 n.15 (Utah Sup.Ct. 1994) (holding that

resolving all ambiguities in an alleged defamatory statement in favor of the plaintiff "effectively

eviscerates the court's responsibility to determine initially if the statement is defamatory as a

matter of law")).  This question of law must be determined by examining the context in which

each statement was made, "giving the words their most common and accepted meaning." *Jacob*,

212 P.3d at 545.  Accordingly, Milton's Complaint must provide enough allegations to determine

the context of each alleged statement. *See Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-CV-

751-TC, 2016 U.S. Dist. LEXIS 19210, at *18-20 (D. Utah Feb. 17, 2016) (rejecting bald

allegations of "other defamatory statements" to be of "no substance," lacking the "content" and

"dates" of conversations and, accordingly, insufficient and "not entitled to discovery").

Defamation per se is more stringent – Milton must show that Bateman's statements fall

into one of four categories: "(1) charge of criminal conduct; (2) charge of a loathsome disease;

(3) charge of conduct that is incompatible with the exercise of a lawful business, trade,

profession, or office; and (4) charge of unchastity of a woman." *Farm Bureau Life Ins. Co. v.

Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178, 1192 (D. Utah 2007).  If a statement is "susceptible to

any meaning other than one falling plainly and unambiguously within the four categories above,"

then it is not *per se* defamatory. *Id.*  Libel per se must also be "directed at the person claiming

injury" and the statements must "on their face, and without the aid of intrinsic proof, be

unmistakably recognized as injurious." *Eagle Air Med. Corp. v. Sentinel Air Med. All., LLC*, No.

2:16-cv-176-TC-EJF, 2018 U.S. Dist. LEXIS 13088, at *7-9 (D. Utah Jan. 25, 2018) (internal

quotations omitted).  Moreover, "rhetorical hyperbole, including 'juvenile name-calling,' is not

defamatory because it cannot 'reasonably [be] interpreted as stating actual facts.'" *See Westmont

Residential LLC v. Buttars*, 2014 UT App 291, ¶¶ 23-25, 340 P.3d 183, 188-89 (citations

omitted).  *See also Prince v. Peterson*, 538 P.2d 1325, 1327-28 & n.4 (Utah 1975) ("simply

making some general statement about another being a crook, or even using profanity against

[another] in a general way, may not be actionable . . . depend[ing] on the circumstances").

The "criminal conduct" category is the only category plausibly relevant to Milton's

Complaint.  Compl. ¶ 22-26.  For a statement to be a "charge of criminal conduct," it must do

more than apply a label that "could be taken out of context as accusing someone of a crime."

*Westmont*, 340 P.3d at 189.  In *Westmont*, the court found that in the context of an online forum

for reviewing businesses, while the term "crooks" could carry a "criminal connotation," "even

the most careless reader [would] perceive[] that the word ['crooks'] was no more than rhetorical

hyperbole."  *Id.* (quoting *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S. Ct.

1537, 26 L.Ed.2d 6 (1970) (addressing the term "blackmail").  Similarly, words such as "mega

scum bag," "cockroaches," "boobs, losers and crooks," "fat thighs, a fake medical degree, and

poor feminine hygiene" have been found not defamatory because the statements did not suggest

"that the author was imparting knowledge of actual facts to the reader."  *Id.* (internal quotations

omitted).  In short, "[e]xaggerated language used to express opinion, such as 'blackmailer,'

'traitor' or 'crook,' does not become actionable merely because it could be taken out of context

as accusing someone of a crime."  *Id.* (internal quotations omitted).  *See also Nunes*, 299 F.

Supp. 3d at 1231-32 (finding accusations of "fraud," "hoax," and "scam" expressed "strong

disapproval of [plaintiff's] efforts to raise money online, not [] a charge of criminally fraudulent

activity;" accusations of harassment expressed an "opinion that [plaintiff's] actions were overly

aggressive, not that [plaintiff] had committed actions that would constitute the crime of

harassment;" and, ultimately, "opinions about the legal significance of [plaintiff's] actions, even

opinions that are questionable, are not actionable as defamation").

Milton's Complaint broadly identifies Bateman's tweets as defamatory, grouping them into five categories:  (1) statements implying Milton wrongfully caused or contributed to factors that caused the suicide of Johnny Robb; (2) a statement claiming that Milton is secretly a "predator," who took violent or nefarious actions to avoid exposure of such secrets; (3) statements claiming or implying that Milton has engaged in or attempted to engage in the sex trafficking of multiple women; (4) statements claiming or implying that Milton has sexually assaulted multiple women; and (5) statements claiming or implying that Milton is a pedophile.

Milton's Complaint only identifies a handful of Bateman's tweets; the remainder are referred to only obliquely.  In the relevant tweets, Bateman makes only a few statements about Milton that are even potentially viewed as "factual"—and they do not charge Milton with criminal conduct.  As demonstrated below, none of Bateman's tweets rise to the level of defamation per se as a matter of law. [21]

> **Tweet No. 1 (9/19/2020 at 12:56 am)**: "Because my dear friend Jonny isn't here to defend himself.  I would never have shared these but you forced my hand @nikolatrevor – **stop lying. own up**" (emphasis added).

This statement contains no assertions of facts – it is Bateman's opinion that Milton is lying about events surrounding Jonny Robb.  Calling Milton a liar is not a charge of criminal conduct in this context. *See Hogan v. Winder*, No. 2:12-CV-123 TS, 2012 U.S. Dist. LEXIS 137399, at *36-37 (D. Utah Sep. 24, 2012) (finding article with a title claiming plaintiff was "facing extortion 'charges'" not defamatory per se because no "reasonable reader would interpret the article to mean that Hogan had been criminally charged with extortion").

---

[21] *See* Tweets, attached to Christensen Decl. as Exhibits D, E, F, and H; *see also* Bateman's Tweets and Replies, https://twitter.com/davidbateman/with_replies.

> **Tweet No 2. (9/19/2020 at 1:29 am)**: "**It was 100% harassment.**
> If only you knew the women he was sending them to. They are
> nice little Church gals out here in Utah who probably wouldn't
> even kiss on the first date" (emphasis added).

This statement contains no assertions of fact – it is Bateman's opinion that Milton

harassed a woman as described in her own text messages with Milton.  It was sent in response to

a third party's tweet suggesting Milton's actions "[c]ould also be considered sexual harassment

depending on the context."  Thus, Bateman states that, in his opinion and what he knows of the

woman concerned, Milton's advances were probably not invited or welcome.  Bateman does not

suggest Milton's behavior was criminal, merely that it did occur as Robb claimed.

> **Tweet No. 3 (9/19/2020 at 2:20 am)**: "During this time Jonny was
> in a very intense manic episode.  We were all trying to help him
> come down.  He was using large quantities of acid, like Milton
> stated.  **That was maybe the only true thing Milton said**"
> (emphasis added).

This statement contains no assertions of fact – it is Bateman's opinion that Milton is

generally lying.  Calling Milton a liar is not a charge of criminal conduct in this context.

> **Tweet No. 4 (9/19/2020 at 2:20 am)**: "So off Jonny went posting
> to his insta story some negative posts about Trevor.  All the stuff I
> remember him posting was [100 emoji] true.  He wasn't trying to
> extort anyone.  **Trevor is just a bit of a slime ball** so Jonny had a
> lot of bad stuff on him without trying" (emphasis added).

This statement contains no assertions of fact – it is a hyperbolic opinion about Milton.

*Westmont Residential*, 340 P.3d at 188-89 ("rhetorical hyperbole, including 'juvenile name-

calling,' is not defamatory because it cannot 'reasonably [be] interpreted as stating actual facts'")

> **Tweet No. 5 (9/19/2020 at 2:20 am)**: "Maybe I'll make a video to
> explain what happened and post it tomorrow.  It's complicated and
> tragic.  Jonny just bad mouthed Trevor online.  They were super
> tight buddies for years, but **Trevor kinda forgot about him when
> he got successful**" (emphasis added).

This statement contains no assertions of fact – it is Bateman's opinion about Milton's

behavior.  Calling Milton a bad friend is not a charge of criminal conduct in this context.

> **Tweet No. 6 (9/19/2020 at 2:40 am)**: "The entire week Jonny was
> interacting with Trevor Milton he was in Cali with a friend who
> saw and heard everything.  He's ready to come forward. **More
> women will likely come forward with Milton's attempts to
> traffic them**" (emphasis added).

This is not a statement of fact about Milton and it does not charge him with criminal

conduct.  It is Bateman's speculative opinion about how unknown third-party women may

behave in the future.  Though his opinion references "Milton's attempts to traffic," in this

context it is rhetorical hyperbole and not defamatory.  *Westmont Residential*, 340 P.3d at 188-89.

> **Tweet No. 7 (9/19/2020 at 2:40 am)**: "**I was 99.9% convinced
> Milton had entrapped him**, though I didn't have all the details.
> **Milton told me he was going to get Jonny put in prison before
> the alleged extortio**n.  Jonny in his manic state was no match,
> especially having let his guard down thinking he'd settled the
> dispute" (emphasis added).

Whether Bateman was convinced of Milton's behavior is not a statement of fact *about*

*Milton*; it is a statement about Bateman's own state of mind.  Regardless, Bateman is not alleging

Milton committed a crime; he is simply attempting to explain what happened to Robb.

Bateman's other statement is a direct reference to Milton's own April 9 text to Bateman, where

Milton stated that "I have shit that would lock [Robb] up for life."[22]  Whether Milton intended to

put Robb in prison is not per se defamatory, especially if Milton's allegations regarding Robb are

true.  Again, Bateman charged Milton of no crime in this context.

> **Tweet No. 8 (9/19/2020 at 3:08 am)**: "After about two weeks in
> jail, Jonny made bail and went home, said goodbye to his family

---

[22]  @davidbateman, "Well done on the vid. Trevor didn't kill Jonny," Twitter (Sept. 19, 2020
10:34 a.m.), https://twitter.com/davidbateman/status/1307357475620880384.  Christensen Decl.
¶ 11, Ex. D.

and took his own life.  I'm sure that wasn't Trevor's desired outcome.  **He just wanted to lock up his former mentally ill best friend for 30 years in federal prison for making him look bad**" (emphasis added).

This statement contains no assertions of fact – it is an opinion about Milton's motives. Bateman later stated that he did not believe Milton killed Robb.[23]  In the context of his other tweets, Bateman did not say that Milton had no reason for involving the authorities.  Regardless, it is not per se defamatory because Bateman did not charge Milton with criminal conduct.

> **Tweet No. 9 (9/21/2020 Tweet at 2:46 am)**: "Messages between Jonny Robb and Trevor Milton obtained from Jonny's phone tonight.  **Does this sound like a man motivated to extort someone, or expose a predator?  Jonny was sent to jail and lost his life because he sent these messages to @nikolatrevor** #nikola #NikolaGate" (emphasis added).

This statement contains no assertions of fact – it is Bateman's opinion that Robb was motivated to expose Milton as a predator, not that Milton is a predator.  Thus, Bateman's opinion on what Robb felt and believed about Milton is not defamatory.  Also, there is no dispute that Robb was sent to jail and lost his life.  Bateman merely speculates there is a relationship between Robb's incarceration and decision to take his life and him sending messages to Milton.

> **Tweet No. 10 (9/20/2020 Tweet at 10:03 pm)**: "Trevor hired her for a upillar.com modeling shoot.  **Of course the shoot was out of town, and he arranged the trip so he'd be sleeping in the same home as the two models he hired.  After pushing him off she berated her and slept on the floor next to her bed all night**" (emphasis added).

Bateman does not charge Milton with criminal conduct.  Based upon text messages between Milton and the unidentified woman, Bateman states that Milton arranged a trip, berated

---

[23] *Id.*

her, and slept on the floor next to her all night.  Essentially calling Milton a creep is not per se defamatory.

> **Pedophile statement:**  In paragraph 20 of his Complaint, Milton alleges: "Bateman's attacks against Plaintiff have not been limited to online posts, calling him a "pedo" to some of Plaintiff's personal acquaintances in Utah."

This conclusory, overbroad, and vague allegation lacks any references to sufficient factual matter to meet *Twombly*'s requirements.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (a complaint must have sufficient "factual matter" - a "formulaic recitation of the elements of a cause of action will not do").  Even if Milton had alleged specific instances of such statements, in the context of sexual assault allegations against Milton, such statements would be a hyperbolic opinion.  *Westmont Residential*, 340 P.3d at 188-89.

> 2.     *Milton is a limited-purpose public figure and has not alleged facts to show that Bateman's tweets were made with actual malice.*

Because Milton is a limited-purpose public figure, he is required to "demonstrate by a standard of clear and convincing evidence that the defamatory statement[s here were] made with 'actual malice," meaning Bateman knew that his statements were false or acted with reckless disregard of whether they were false."  *World Wide*, 450 F.3d at 1136.  The Complaint alleges that Bateman's conduct was intentional or reckless, but it provides no "sufficient factual matter," *see Twombly*, 127 S. Ct. at 1965, regarding the required element of actual malice.

For purposes of this Motion, Milton satisfies the elements of a limited-purpose public figure, one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  *SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1295-96 (D. Utah 2010).  "Utah employs a two-part test to determine whether the plaintiff is a limited-purpose public figure.  First, the court must isolate the specific

public controversy related to the defamatory remarks.  Next, the court should examine the type

and extent of the plaintiff's participation in that public controversy to determine whether…he has

thrust himself to the forefront of the controversy in order to influence the resolution of the issues

involved.'"  *Id.* (quotation simplified).  These facts are determined as they existed before the

defamation was published, *Wayment*, 116 P.3d at 281, and they are a question of law.  *World

Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1136-37 (10th Cir. 2006).

> **a.** **There is an ongoing public controversy concerning the aggressive sexual behavior of powerful men, such as Milton.**

A "public controversy" is "not simply a matter of interest to the public; it must be a real

dispute, the outcome of which affects the general public or some segment of it in an appreciable

way."  *Wayment*, 116 P.3d at 284.  "A public 'controversy' is any topic upon which sizeable

segments of society have different, strongly held views."  *Id.* (quoting *Lerman v. Flynt Distrib.

Co.*, 745 F.2d 123, 138 (2d Cir. 1984)).  "If the issue was being debated publicly and if it had

foreseeable and substantial ramifications for nonparticipants, it was a public controversy."  *Id.*

There are several intertwined public controversies here.  The broader context of Milton's

alleged conduct is the #MeToo movement, which has generated significant public controversy as

to the aggressive, non-consensual sexual misconduct of powerful men, especially with respect to

younger or otherwise subordinate women, and the willingness of many women to discuss these

matters publicly.  And in September of 2020, Milton was involved in a firestorm of allegations

against him, including the Hindenburg Report alleging fraud.  Milton personally responded to

these allegations on social media, including Twitter, causing his public profile to rise

significantly along with questions about his personal conduct.[24]

More specifically, in the wake of headline news regarding Milton's fraud, *and before Bateman started tweeting about Milton,* the Whole Mars Catalog Blog published on Twitter an audio recording of an interview where Milton described Robb's alleged extortion attempts; attacked Robb's character; explained generally the kind of information Robb threatened to reveal, which Milton claimed was fake; admitted Milton got the FBI involved; and acknowledged that some people blamed Milton for Robb's death.  *See* Compl. ¶ 10; Whole Mars Interview.  In the Whole Mars interview, Milton also discussed Bateman, who although not mentioned by name is described as Robb's "friend," who had "done well" and had "become wealthy," and alleges this friend had "egged him [Robb] on to essentially extort me."  Whole Mars Interview.

With the audio recording, Whole Mars also published a link to an April 16, 2020 news story on KSL.com regarding Milton and Robb that includes a reference to charges against Robb that: "The posts show defendant [Robb] asking the female about possibly embarrassing behavior

---

[24] *See, e.g.*, Hindenburg Report (collecting news articles); @WholeMarsBlog, "hoooolllyyyy cow," *Twitter* (Sept. 11, 2020 4:50 p.m.) (sharing clip of Financial Times article comparing Milton to Elizabeth Holmes, the famously disgraced founder of blood-testing start-up Theranos), https://twitter.com/WholeMarsBlog/status/1304552969979875328; @WholeMarsBlog, "We now have multiple people," *Twitter* (Sept. 19, 2020 11:54 a.m.) ("We now have multiple people who know Trevor saying that Facebook Messenger DM we saw was not an isolated innocent [sic: incident] apparently he tried to pay other women to do the same thing?"), https://twitter.com/WholeMarsBlog/status/1307377541758423040; @WholeMarsBlog, "Trevor Responds!," *Twitter* (Sept. 11, 2020 11:48 a.m.) (sharing Milton's video addressing the Hindenburg Report), https://twitter.com/WholeMarsBlog/status/1304477026372317185. Screenshots of the foregoing tweets are attached to the Christensen Decl. as Exhibit K.

(the man) [Milton] had allegedly committed in the past."[25] The KSL.com story also refers to the civil stalking injunction Milton, the "CEO and co-founder of Nikola Motor Co.," filed against Robb. Whole Mars' publication on Twitter of its interview with Milton, together with the KSL.com story—and the related public controversy—was the genesis for Bateman's tweets at issue in this case, *i.e.*, Bateman disclosed the same type of information showing Milton's alleged sexual misconduct that Robb threatened to disclose.

In short, there is presently a public debate—generated by third parties and Milton himself—regarding the sexual conduct of Milton and other men in positions of power. These are matters into which Milton thrust himself, on his own accord, to the public and to the media. It has generated "different, strongly held views" as to the broader culpability of men for improper sexual conduct, whether men engaged in such conduct are fit to lead others, and whether Milton specifically has joined or will join the ranks of public figures disgraced by such behavior. *See SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1295-96 (D. Utah 2010) (finding a public controversy on the mundane subject of computer code copyright ownership and infringement).

**b.      Milton is at the forefront of this controversy.**

A person becomes a public figure when "he has thrust himself to the forefront of the controversy in order to influence the resolution of the issues involved." *SCO Grp.*, 692 F. Supp. 2d at 1295. The interests balanced in this analysis are the First Amendment right to speech and a state's right to compensate individuals for a defamatory falsehood. Public figures receive less protection than private individuals both because the former "are able to engage in 'self-help,'

---

[25] Pat Reavy, *Man arrested, accused of trying to extort Utah billionaire*, KSL (Apr. 16, 2020), https://www.ksl.com/article/46742440/man-arrested-accused-of-trying-to-extort-utah-billionaire. Screenshots of this article are attached to the Christensen Decl. as Exhibit L.

counteracting defamatory statements through their own access to and use of 'the channels of effective communication'" and because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood." *Wayment*, 116 P.3d at 279.

Here, Milton voluntary exposed himself to increased risk of injury from defamatory falsehood through his efforts to build a successful *public* company and to build a significant social media presence on both Twitter and Instagram.[26]  With this robust social media network, Milton has "access to and use of the channels of effective communication" and is able to defend himself in ways a private citizen could not.  Moreover, Milton further chose to inject himself into the specific controversy surrounding Robb's death by spreading his version of events to a public audience, including through an interview that was recorded and shared by Whole Mars.  Milton cannot be heard to complain that his own interview with Whole Mars generated publicity, including Bateman's tweets.  Finally, Milton has certainly invited attention and comment on his running the business of Nikola and his personal conduct.[27]  *See World Wide*, 450 F.3d at 1136-37

---

[26]  In September 2020, Milton had over 100,000 followers on Twitter.  *See* Internet Archive, "https://twitter.com/nikolatrevor," (Sept. 21, 2020), https://web.archive.org/web/20200921133424/https://twitter.com/nikolatrevor.  The Internet Archive is a free digital archive of portions of the World Wide Web that allows users to see what websites looked like in the past.  Milton's number of followers is significant compared to similarly situated business leaders in Utah.  For example, Josh James (Domo) has 47,500 followers and Ryan Smith (Qualtrics) has 21,000 followers.  Screenshots of the profiles of Milton, James, and Smith are attached to the Christensen Decl. at Exhibits I and J.

[27] Milton has not been shy about seeking media attention.  By way of example, in 2020 Milton voluntarily participated in multiple interviews with news outlets regarding Nikola, including with CNBC on August 5, 2020, https://www.youtube.com/watch?v=OPhN8saJkAI; Fox Business on June 30, 2020, https://www.youtube.com/watch?v=u0yMmPA7NjY; Cheddar TV on June 11, 2020, https://www.youtube.com/watch?v=4gK00jZl588; Fox Business Barron's Roundtable on August 1, 2020, https://www.youtube.com/watch?v=nbrgQj4xlbk; and CNN on June 19, 2020, https://www.youtube.com/watch?v=d65pNzb_b2U.  *See* Christensen Decl. ¶ 20.

(finding plaintiff to be a limited-purpose public figure where its mission was related to the public controversy and it promoted itself and its programs).  Milton satisfies the test.

As a limited-purpose public figure, and without sufficient factual matter to support allegations of actual malice, Milton's claims should be dismissed as a matter of law.  The Complaint alleges that Bateman's conduct was intentional or reckless, but it provides no factual support for allegations of actual malice, let alone the factual support necessary to meet *Twombly* plausibility requirements.  On the contrary, Bateman's tweets show his intent was to rebut Milton's public allegations about Robb and his implications regarding Bateman's involvement.  *See* 9/19/2020 Tweet at 12:56 am ("Because my dear friend Jonny isn't here to defend himself.  I would never have shared these but you forced my hand @nikolatrevor – stop lying. own up");[28] 9/28/2020 Tweet at 8:34 p.m. (tweeting CNBC article and stating: "RIP Johnny").[29]

### B.   Milton Cannot Establish a Claim for Public Disclosure of Private Facts

To establish a claim for public disclosure of private facts, a plaintiff must prove the following elements by a preponderance of the evidence:

(1)   the disclosure of the private facts must be a public disclosure and not a private one;
(2)   the facts disclosed to the public must be private facts, and not public ones;
(3)   the matter made public must be one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; and
(4)   the public does not have a legitimate interest in having the information made available.

---

[28]  @davidbateman, "Because my dear friend Jonny isn't here to defend himself," Twitter (Sept. 19, 2020 12:56 a.m.), https://twitter.com/davidbateman/status/1307212066017521667. Christensen Decl. ¶ 11, Ex. D.

[29]  @davidbateman, "RIP Johnny," Twitter (Sept. 28, 2020 8:34 p.m.), https://twitter.com/davidbateman/status/1310769883270053889.  Christensen Decl. ¶ 15, Ex. H.

*Shattuck-Owen v. Snowbird Corp.*, 2000 UT 94, ¶ 11, 16 P.3d 555, 558).  Utah courts rely on the Restatement (Second) of Torts for these elements and their interpretation.  *See, e.g.*, *Shattuck-Owen*, 16 P.3d at 558.  Milton's Complaint fails to meet these elements.

1.     *The public has a legitimate interest in sexual assault allegations against powerful men like Milton.*

Whether a matter is of "legitimate public concern" depends on its "newsworthiness, taking into consideration the customs and conventions of the community." *Judge v. Saltz Plastic Surgery, P.C.*, 2016 UT 7, ¶ 13, 367 P.3d 1006, 1011 (Sup. Ct.) ("*Judge II*") (citing Restatement (Second) of Torts § 652D, cmt. d (1977)).  In the #Me Too era, Milton, the billionaire and recent chairman of a public company accused of massive investor fraud, cannot credibly argue that his alleged sexual misconduct is not a legitimate public concern.

Whether facts are newsworthy also depends on whether the plaintiff is high-profile:

> One who voluntarily places himself in the public eye, by engaging in public activities, or by assuming a prominent role in institutions or activities having general economic, cultural, social or similar public interest, or by submitting himself or his work for public judgment, cannot complain when he is given publicity that he has sought, even though it may be unfavorable to him.

Restatement (Second) of Torts, § 652D, cmt. e.

Milton is undisputedly a high-profile individual who "engag[es] in public activities," has assumed "a prominent role in institutions or activities having general economic, cultural, social or similar public interest," and has "submitt[ed] himself or his work for public judgment." Restatement (Second) of Torts § 652D, cmt. e.  Wikipedia states Milton is an "American

billionaire, and founder and former executive chairman of Nikola Corporation."[30]  At one time,

he had more than 100,000 Twitter followers.

On September 10, Milton was further thrust into the public eye by the Hindenburg

Report, which accused him of making false statements over the course of many years and

resulted in inquiries by the SEC and DOJ.  Having thus placed himself in the public eye, Milton

"cannot complain when he is given publicity that he has sought, even though it may be

unfavorable to him."  Restatement (Second) of Torts § 652D, cmt. e.  *See also id.*, cmt. f ("Those

who commit crime or are accused of it may not only not seek publicity but may make every

possible effort to avoid it, but they are nevertheless persons of public interest, concerning whom

the public is entitled to be informed.").

Milton's involvement in Robb's arrest and tragic death, including the potential veracity

of Robb's allegations against Milton, are thus matters of legitimate public interest, especially

here in Utah where it occurred and was covered by every news outlet.  *See, e.g. Judge II*, 367

P.3d at 1011 (citing Restatement (Second) of Torts § 652D, cmt. d (1977)).  In response to

Milton's statements published on Twitter, Bateman tweeted about Milton and Robb's

relationship and the veracity of Robb's allegations against Milton.  *See* Compl. ¶¶ 10-19.[31]

Given their context, Bateman's tweets provided information about Milton in which the public

---

[30]  Wikipedia, *Trevor Milton* (Oct. 22, 2020) (collecting news sources regarding the Hindenburg Report and federal investigations), https://en.wikipedia.org/wiki/Trevor_Milton.  Christensen Decl. ¶ 5.

[31]  *See also* Kristen Korosec, *Nikola disputes fraud claims in carefully worded rebuttal*, TechCrunch (Sept. 14, 2020), https://techcrunch.com/2020/09/14/nikola-disputes-fraud-claims-in-carefully-worded-rebuttal/ ("Nikola's lengthier denial follows a series of tweets made last week by the company's founder, Trevor Milton, who called the report by the activist short-seller a 'hit job' based on false allegations.").  Christensen Decl. ¶ 6.

had a legitimate interest.  Restatement (Second) of Torts § 652D, cmt. h.  Milton's alleged sexual

assaults are unquestionably relevant to his alleged attempts to defraud investors and his

interactions with Robb.  Bateman's tweets tell "what kind of person" Milton is by showing his

interactions with others.  Restatement (Second) of Torts § 652D, cmt. h.  Accordingly,

Bateman's tweets did not invade Milton's privacy.

> 2.    *Many of the statements in Bateman's tweets were already publicly disclosed.*

Private facts are those which have not already been disclosed to the public.  Restatement

(Second) of Torts § 652D, Cmt. a.  There is no claim where a defendant "merely gives further

publicity to information about the plaintiff that is already public."  *Doe v. Yesner*, No. 3:19-cv-

0136-HRH, 2019 U.S. Dist. LEXIS 150133, at *32-33 (D. Alaska Sep. 4, 2019).

Bateman's tweets about Milton's involvement in Robb's death give further publicity to

information that was already known.  Robb's alleged extortion attempt was headline news in

Utah.  And Milton discussed Robb with a public audience, which was then disseminated by

Whole Mars via its Twitter account.  Compl. ¶¶ 10, 14.  In the audio recording uploaded by

Whole Mars, Milton described Robb's alleged extortion attempts; attacked Robb's character;

explained generally the kind of information Robb threatened to reveal, which Milton claimed

was fake; admitted Milton got the FBI involved; and acknowledged that some people blamed

Milton for Robb's death.  This recording was published by Whole Mars ***six days*** before

Bateman's tweets—in fact, Bateman's tweets were all in response to Milton's seemingly

calloused discussion of Robb.  Because the Complaint's allegations are about the implications,

not the specific details, of the tweets, the relevant tweets do not meet the elements for public

disclosure of a private facts.

3.      *Bateman's tweets are not highly offensive or objectionable.*

The Complaint misstates a necessary element of public disclosure as "shame and/or humiliation."  Compl. ¶ 30.  But facts must be more than embarrassing to give rise to a claim for invasion of privacy.  The relevant standard is whether the disclosed facts are "highly offensive and objectionable to a reasonable person of ordinary sensibilities."  *Barker v. Manti Tel. Co.*, No. 2:06-CV-00812-TC-SA, 2009 U.S. Dist. LEXIS 819, at \*13-14 (D. Utah Jan. 6, 2009) (fact that plaintiff had a $1,500 phone bill to Tonga was not highly offensive and objectionable).  "[M]ere undesired publicity will not suffice."  *Sandler*, 565 F. Supp. 2d at 198.  A plaintiff cannot show the required offensiveness if he has himself published the same or similar information.  *Id.*

In the #MeToo era, the public understands the compelling social justice and gender equity reasons for disclosures of alleged sexual misconduct, especially against men in powerful public positions like Milton.  Bateman's tweets are not highly offensive *and* objectionable to reasonable persons.  Though the subject matter is discomfiting, such disclosures are necessary to arrive at a more just and equitable society and to bring closure and justice to the victims specifically.  Here, Bateman's tweets are legitimate sources of information for the public to weigh and consider in the wake of numerous allegations against the billionaire business leader.

## IV.    CONCLUSION

Milton's attempt to silence Bateman's protected speech is troubling and misguided.  Based on the foregoing reasons, this Court should dismiss Milton's Complaint under Rule 12(b)(6) for failure to state a claim for defamation per se and public disclosure of private facts.

DATED this 26th day of October, 2020.

**HOLLAND & HART, LLP**


/s/ Darren G. Reid
Eric G. Maxfield
Darren G. Reid
Brandon T. Christensen
*Attorneys for Defendant*

15591997_v4